MAYOR AND ALDERMEN OF MOBILE *vs.* WARING.

[BILL IN EQUITY TO ENJOIN COLLECTION OF CITY TAX.]

1. *Offer to do equity.*—A tax-payor, seeking to enjoin the collection of a tax imposed by a municipal corporation, can not obtain equitable relief on account of an excess of taxes, unless he offers in his bill to pay the amount admitted to be justly due.
2. *State taxation of imports.*—A person who purchases goods from an importer, after they have been brought within the boundaries and jurisdiction of the United States, but before they have been delivered at the port of entry, and before duties have been paid on them, and who then transports them, at his own expense, to the port to which they were consigned, is not an importer, and is not entitled to be subrogated to the rights and immunities of his vendor; but the goods, or the proceeds of their sale, are subject in his hands to taxation by State authority, although he retains and sells them in the unbroken packages in which they were imported.

APPEAL from the Chancery Court at Mobile.
Heard before the Hon. N. W. COCKE.

THE bill in this case was filed, on the 26th June, 1866, by Moses Waring, against the corporate authorities of the city of Mobile, and the city tax-collector; and sought to enjoin the collection of a tax, assessed under an ordinance of said municipal corporation, of fifty cents on each hundred dollars gross proceeds of the sale of merchandise after the 1st January, 1866. The new charter of the city of Mobile was passed on the 2d February, 1866.—See Session Acts, 1865-6, p. 202. The 37th section of the charter is in these words: "That the said mayor, aldermen and common council shall have power to lay taxes on the real and personal estate, auction sales, and sales of merchandise, capital employed in business, and income within said city, and a head tax upon all the male inhabitants over the age of twenty-one and under sixty; that the said tax upon the personal and real estate be laid in pursuance of an assessment and valuation of the said personal and real estate, to be made by some discreet person thereto appointed as assessor by the said corporation, which tax shall be laid in the manner following: The said assessment or valuation, when completed, containing all the property as well as the names of the owners thereof, shall be lodged with the clerk of the corporation, and the mayor, aldermen and common council shall assess so many cents on the dollar, making no distinction as to any persons, and which assessment or valuation, together with the names of the persons liable to taxation, with the tax laid thereon, shall be open for inspection to all and every person interested therein; and the said mayor, aldermen and common council shall give ten days' public notice in some newspaper printed within the limits of the city of Mobile, that the said assessment or valuation, together with the tax laid thereon, is ready for inspection; and if any person shall be dissatisfied with said assessment or valuation, or tax laid thereon, he shall give notice to the mayor, aldermen and common council to alter said assessment or valuation, together with the tax assessed thereon, as to them shall seem meet (witnesses shall be heard on oath to affix a proper valuation); but their decisions shall be final as to all questions or objections that may be brought before them in reference to the said assessment

or valuation, and the tax assessed thereon as aforesaid; and after twenty days have elapsed from giving the notice that the said valuation or assessment, together with the tax assessed thereon as aforesaid, are ready for public inspection, the said mayor shall issue his warrant annexed to the tax list to the collector of the corporation, containing a description of the real estate taxed, together with its valuation and the taxes assessed thereon, and also the amount of the personal property valued or assessed to each person, together with the tax assessed thereon, and the name of each person liable to a head tax, and the amount of such head tax laid; and provided that each person liable to pay the tax upon sales at auction and sales of merchandise shall, once in every three months, to-wit, on the first day of January, first day of April, first day of July, and first day of October, give in, under oath, the gross amount of sales of each three months, from the first day of October, 1865, and each three months thereafter, to the city tax-collector, whose duty it shall be to collect the tax so laid by the mayor, aldermen and common council; and upon the failure of any person to report such sales for the preceding quarter, then the mayor, aldermen and common council may provide and enforce such penalties as they may deem necessary for the enforcement and collection of such taxes; and provided further, that no tax shall be laid upon sales under judicial proceedings, guardians', executors', and administrators' sales, and sales of property under the provisions of deeds for the security or payment of debts; but it is expressly understood that the duties of the tax-collector for the collection of sales of merchandise shall in no wise relate to the sales of cotton." The municipal ordinance, under which the tax was assessed, was adopted on the 21st March, 1866; and an amendment of it was adopted on the 9th May following. One section of this ordinance required " all persons who have sold, or who may have been engaged in the sale of any merchandise, at private or auction sales," after the 1st January, 1866, to make quarterly returns, under oath, to the city tax-collector, "of the gross amount of their sales of merchandise and auction sales"; and provided, that any person who failed or refused to make such returns,

within ten days after public notice by the tax-collector, should be fined by the mayor. The complainant refused to make returns of his sales, on the ground that he was not liable to the tax, and was twice fined by the mayor for his refusal; and the judgment of the mayor was affirmed, on appeal, by the city council.

The allegations of the bill, as to the nature of the complainant's business, on which he based his claim of exemption from liability to the tax, were in these words: " Your orator further shows, that on, before, and since said 1st January, 1866, he has carried on in Mobile the business of selling salt, the product of countries foreign to the United States and to the State of Alabama. His said business has been confined to the sale of said salt to traders, or dealers, in the original packages, as the same were ;imported into the port of Mobile from such foreign countries. His said sales have not been to consumers, and have been in the unbroken original packages. These transactions comprise the only sales of merchandise made by him in the city of Mobile. His manner of business has been as follows: he purchases the said foreign salt, which is of English manufacture, and brought from the port of Liverpool, by the cargo, and from the foreign shippers thereof, either at sea, on the voyage of importation, or before the voyage of importation is completed, and before the hatches of the vessel, on which it is laden, are opened, or bulk broken, and before the cargo is entered at the custom-house for the payment of duties; he receives it from the vessel, on which it is brought from said foreign producing country, in the bay of Mobile, and before the same comes within the limits of the city of Mobile; and himself causes said merchandise to be brought into the city, and placed in store, for sale as aforesaid, and furnishes the money to pay the duties on it. In this mode and manner, all the business of your orator with regard to the receipt and sale of salt has been conducted by him since the 1st January, 1866. The gross sales thereof, from said date to the 1st April, 1866, have been forty thousand and thirty-three 61-100 dollars. Your orator charges, that his said business is not subject to the tax sought to be imposed on it by the said mayor, aldermen, and common

council of the city of Mobile, and said tax is illegal and oppressive."

Separate answers were filed by the municipal authorities and the tax-collector. The material portions of the corporation's answer, in response to the allegations of the bill above quoted, were as follows: " Respondents admit, that complainant has carried on the business of selling salt in the city of Mobile since the 1st January, 1866; but they do not know, and therefore do not admit, that said salt is altogether the product of countries foreign to the United States and the State of Alabama; or that his business has been confined to the sale of said salt to traders or dealers, in the original packages, as the same were imported into the port of Mobile from foreign countries; or that his said sales have not been to consumers, and have been in the unbroken original packages; or that these transactions comprise the only sales of merchandise made by him in the city of Mobile; and so far as the said statements or allegations may be material, or may affect the rights and interests of these respondents, they require strict proof of the same. Respondents know nothing, of their own knowledge, of complainant's manner of business, as alleged in his bill; and they require strict proof of the same. They deny that complainant purchases said salt at sea, or [on] the voyage of importation, or before the voyage of importation is completed; but, on the contrary, they are informed, and believe, and state, that he purchases said salt, brought from the port of Liverpool, of the foreign shippers or consignees thereof, after the ship or ships on which it is laden arrive within the port or harbor of Mobile, with the intention of unlading the same. These respondents have caused inquiry and examination to be made in the records of the custom-house in Mobile, and state, that the entry of said salt at the said custom-house, for the payment of duties, is not made by the complainant, but by the consignees thereof; and that the consignees thereof pay the duties thereon, and are the persons who are allowed a credit therefor in said custom-house; so that these respondents in fact deny that complainant is an importer of said salt, and that his said business and the gross amount of his sales of said salt are

not subject to the tax sought to be imposed thereon, and that said tax is illegal and oppressive." Each of the answers contained a demurrer to the bill, for want of equity, and because it did not show on its face that the complainant was the importer of the salt sold by him; and several special grounds of demurrer were assigned, which require no particular notice.

Several depositions were taken by both parties, for the purpose of showing the character of the complainant's business, and the manner in which it was carried on; but, as to the material facts, there was no conflict in the evidence. Geo. W. Owen, whose deposition was taken at the instance of the complainant, and whose testimony was corroborated by the other witnesses, thus stated the transactions of which he had personal knowledge: " I am engaged in the shipping and commission business in Mobile, and was so engaged in the years 1865 and 1866. Up to December 1, 1865, I was clerk and book-keeper for D. Wheeler & Co., and have been a partner in said firm since that date. So far as I know, complainant's chief business is that of a dealer in salt, and was in 1865 and 1866. I had commercial transactions with him during these years. My transactions with him related to salt. Our firm was acting, in these transactions with him, for foreign merchants. The salt purchased from us by him was the product of Great Britain, and was brought to Alabama in ships. In many instances, we are advised by the owners of a cargo of salt in England, of the shipment of such cargo to this port; and we have thereupon, in some instances, when we thought it to the advantage of the owners, sold such cargo to the complainant, ' to arrive.' In other instances, vessels have arrived in the bay of Mobile, with salt for ballast, seeking a market, and, after remaining a short time, making inquiries, and ascertaining the probability of obtaining freight here, have determined to dispose of the salt, and unload; and we, as consignees, have thereupon sold the cargoes of salt, in the original packages, to the complainant, on board the vessel in the bay of Mobile; one condition being, that we are in no way liable or responsible for the salt after its delivery to the complainant's barge or lighter alongside the

vessel. In other instances, vessels, after arriving, seeking a market, and ballasted with salt, finding that they could not do well here in respect to freight, have left for other ports, without breaking bulk, or unloading any portion of the salt. In our sales of salt to the complainant, within the last two years, we have acted solely as the agents of the foreign owners, and accounted to them for the proceeds, which we usually applied to the disbursements of the vessel. The salt is delivered to Waring, from the ship, in the bay of Mobile, about thirty miles below the city; and he assumes all the risks and expenses in reference to it, upon such delivery. It is delivered to him by the captain, or chief officer of the ship, after having been advised by us of the sale to him. When delivered, as aforesaid, the salt is brought to the city in barges, or sail lighters, at the expense, risk, and direction of the purchaser. The purchase invariably embraces the whole cargo of salt. The sale is sometimes made before, and sometimes after the arrival of the ship in the bay of Mobile. The cargo is always still on board at the time of the sale, and before bulk is broken; but whether before or after the hatches are taken off, I can not say. I presume there is no particular time for taking off the hatches, as I understand these to be merely kept on during the voyage to preserve the cargo. The sale is always made before the cargo is entered at the customhouse for the payment of duties. No vessel, from which we have ever sold complainant a cargo of salt, has ever come nearer to the city of Mobile than the anchorage in the lower bay. The manner of our sales to complainant has been as follows: we sell him the salt, deliverable in the bay, alongside the ship, he assuming the risk and expense of its transportation to the city, and from the moment of its reception on board the barge or lighter. In many instances, when we have not had sufficient idle funds on hand to pay the duties on the salt, we have called upon him for an advance of the purchase-money. In other instances, we have paid the duties, without having recourse to him; but, in either case, the amount of duties so paid is charged in the sales. The duty to be paid is ascertained by weight, (being about twenty-four cents in gold per hundred pounds,)

and the weighing is done by a custom-house officer, after the landing of the salt on the wharf in Mobile, and always after the contract of sale with the complainant. We are sometimes advised of the shipment of the salt by the owners in the foreign port. and at other times we have no advices or information as to the shipment until the arrival of the ship in the bay of Mobile. When we sell 'to arrive,' the salt is the property of Mr. Waring upon its arrival in the bay of Mobile; and in other cases, it is the property of the foreign shippers. At the time of the unlading, so far as our sales to him since the close of the war are concerned, it has been his property at the time of unlading. The sale has always been made before the entry of the salt for the payment of duties, and the salt became his property. It is always taken and brought to the city at his risk."

The chancellor overruled the demurrer, and, on final hearing on pleadings and proof, rendered a decree 'for the complainant, perpetually enjoining the collection of the tax as against him; and his decree is now assigned as error.

R. H. SMITH, W. BOYLES, and THOS. H. HERNDON, for the appellants, made the following (with other) points: 1. The bill shows no ground for an injunction.—*Burnett v. Craig*, 30 Ala. 139; 19 Eng. L. & Eq. 639, and cases there cited; 35 Penn. St. R. 95; 38 Penn. St. R. 102; 23 Conn. 609; 8 Gill, 433; 24 Missouri, 273; 1 Halst. Ch. 410; Hill on Injunctions, 15; 1 Barbour, 219; 7 Paige, 60; 26 Barbour, 303; 15 Barbour, 375; 6 Johns. Ch. 28; 4 Johns. Ch. 352; 25 Conn. 232.

3. Neither the averments of the bill, nor the facts established by the evidence, show that the complainant is an *importer* of the salt sold by him. He does not bring the salt into the country; he does not make the entry at the custom-house; he does not pay the duties, except indirectly, and in the same sense in which every purchaser and consumer pays them; he does not pay the freight; and his purchase is not complete, until after the vessel has arrived at her port of destination, and not then until the salt is actually delivered to him. These facts, tested by the law, show that he is not an importer.—1 Gallison, 209, 239, 245,

365; 3 Peters, 304; 1 Mason, 499–503; 5 Cranch, 368; 9 Cranch, 104; 1 Peters, C. C. 256. In the mercantile sense of the words, the bay of Mobile is the city of Mobile; and that is the sense in which the words must be understood.—1 Arnould on Insurance, 77; 2 Taunton, 405, 408; 3 B. & Ald. 460; 4 Ald. & El. 211. This, too, is the uniform construction of the treasury department of the United States, as the proof shows.—5 Cranch, 372.

3. Not being the importer, the complainant can not claim exemption from State taxation, on the ground that he has already paid the United States for the privilege of selling. The importer paid the government for this privilege, and exercised the privilege in the sale to the complainant; and in the hands of the purchaser, whether retained or sold by him, the goods lost the character of imports, within the meaning of the Federal constitution, and became liable, like other property, to State taxation.—*Brown v. State of Maryland*, 12 Wheaton, 439–43; *Passenger Cases*, 7 How. 491; *License Cases*, 5 How. 575, 587, 589; 14 Georgia, 438.

4. Even if the imported goods, in the hands of the purchaser, were not subject to taxation under State authority, the exemption could not be extended to the proceeds of sales. There must be a limit to the restriction on State authority; and if the proceeds of sale in the hands of the purchaser are exempt, because they arise from the imports, the immunity could as well be claimed for any property whatsoever, in which those proceeds might be invested. Authorities last above cited.

P. HAMILTON, *contra.*—1. The equity of the bill is maintainable on several distinct grounds. It seeks to enjoin the collection of an illegal tax, to prevent a multiplicity of suits, and to prevent an injurious act by a public officer, for which the law might give no adequate redress. The right to an injunction, under the facts of the case, is shown by the following authorities: *Carroll v. Safford*, 3 Howard, 441; *Ottawa v. Walker*, 21 Ill. 605; 15 Ill. 202; 20 Ill. 327; 38 Penn. St. 309; *Mott v. Penn. Railroad Co.*, 30 Penn. St. 9; *Dodge v. Wolsey*, 18 Howard, 331; *Culbertson v. Cincinnati*, 6 Ohio, 579; *Burnett v. Cincinnati*, 3 Ohio, 73; *Morris Canal and*

*Banking Company v. Jersey City*, 1 Beasley's Ch. 252; *Sheldon v. Buskirk*, 2 Comstock, 475; 7 Barbour, 132; 3 Sandford, 407.

2. Is the municipal tax, in its application to the complainant, illegal? The constitution of the United States declares, that no State shall, without the consent of congress, "lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws." This constitutional provision, it will be observed, exempts imports, and not importers, from State taxation. It looks, not to the ownership, but to the subject of the commerce. Its object was, to give congress the entire regulation of all that pertains to the foreign commerce of the country, and the exclusive power of imposing duties on imports, except in the matter relative to inspection laws. Imports are the articles themselves which are brought into the country; and a duty on imports is not merely a duty on the act of importation, but a duty on the thing imported. When the thing imported has become incorporated and mixed up with the mass of property in the country, and not until then, it loses its distinctive character as an import, and becomes subject to the taxing power of the State. Congress has the exclusive power of declaring what commerce shall be carried on with foreign nations, what products of those nations shall be introduced here, and under what restrictions.—*Brown v. Maryland*, 12 Wheaton. The exemption from taxation is for the thing imported, and continues until that thing has come within the jurisdiction and control of the State; and no change in the form of the tax can evade or infringe the exemption, whether it be attempted in the form of a tax on the occupation, or on the person, or on the bill of lading.—*Passenger Cases*, 7 Howard; *Almy v. California*, 24 Howard.

The complainant comes within the protection of the constitutional provision, as construed and explained in the adjudications of the supreme court of the United States. His purchases are made in the original packages, before the completion of the voyage of importation, and before the goods are entered at the custom-house; he pays the duties, or advances the money to pay them; and he sells

Mayor and Aldermen of Mobile v. Waring.

the goods in the original packages. While in his hands, they are merely *in transitu*, and have not become mingled with the great mass of property in the State; and their character is not changed, until they have passed from his hands. While in the bay of Mobile, the vessel and its cargo are entirely under the control of the United States, whose officers board the vessel, obtain information of the cargo, report its character and condition to the custom-house, grant permits for landing the goods, and collect the duties; and the regulations of the custom-house, as to the name in which the goods are entered, are intended simply to facilitate the transaction of its business, and have a responsible party with whom its officers can deal. Having paid the duty levied by the United States, the complainant acquires the right to sell, without restriction or taxation by State authority. "The object of importation is sale. It constitutes the motive for paying duties; and if the United States possess the power of conferring the right to sell, as the consideration for which the duty is paid, every principle of fair dealing requires that they should be understood to confer it."—12 Wheaton, 461. Nor can the proceeds of sales, in the hands of the complainant, be subjected to a State tax; for that would be doing indirectly what can not be done directly. A tax in the form of a license on the business of importing, is a tax on imports. "Any charge on the introduction and incorporation of the articles into and with the mass of property in the country must be hostile to the power given to congress to regulate commerce; since an essential part of that regulation, and the principal object of it, is to prescribe the regular means for accomplishing that introduction and incorporation."—12 Wheaton, 448.

3. Another objection to the tax is, that it is claimed for a long period prior to the passage of the ordinance, and even before the adoption of the city charter under which that ordinance was passed. That portion of the ordinance which affixes a penalty for not making returns of sales made before its adoption, is an *ex-post-facto* law, and therefore illegal and void.

BYRD, J.—1. The counsel for the appellee insists, that the city authorities are claiming the right to assess against and collect from him taxes, for a greater period than that authorized by law. However this may be, it is apparent, if the city has any right to assess and collect the tax claimed, it has a clear right to do so for a part of the period, if not for the whole; and as the appellee refused to account at all, and did not offer in his bill to account for any part of that period, he is not entitled to maintain his bill on the ground that the city claimed more than it had a right to demand. The familiar maxim, that he who seeks equity, must do (or offer to do) equity, applies with full force to the case made by the bill. And this brings us to the consideration of the main point involved in the decision of this cause.

2. The authority of the State to confer the power of taxation upon a municipal corporation, is not questioned by counsel; nor do they question the constitutionality of the act under which the municipal authorities of Mobile were proceeding to assess the tax. The point made by the counsel for the appellee, as we understand it, is, that the act in question did not authorize the assessment and collection of taxes on the amount of sales of the salt bought and sold by the appellee, under the facts and circumstances shown by the evidence in this cause; or, if it did, that then the act, *to that extent*, is unconstitutional. Without intending to intimate an opinion, we remark, that we are not aware of any principle of law, or constitutional provision, which would inhibit the State legislature from authorizing by law the assessment and collection of taxes upon sales of merchandise sold previous to the passage of the law; and if the ordinance went beyond the authority conferred by the act, to that extent it would be null and void. In our opinion, the act, and the ordinance adopted, have a constitutional field of operation, and are, therefore, valid.

It appears from the evidence, that appellee purchased the salt in the years 1865-6, from the consignees at Mobile; some was contracted to be purchased after it left Europe, and before its arrival in the bay of Mobile; and a part was purchased after it arrived in that bay, and before it was

entered at the custom-house of the port of Mobile.   Without stating all the facts proved by the testimony, we are satisfied that the appellee was not the importer of the salt, within any legal or commercial meaning of that term.   He bought from the importer, or his consignee.   A person who purchases goods from an importer, after they have been brought within the boundaries and jurisdiction of the United States, but before he pays duty on them, or they are delivered at the port of entry, and who then transports them at his own expense, from the place where they were when bought, to the port to which they were consigned, can not be held to be an importer.

But the question arises, whether, under such circumstances, and those in proof, the purchaser of an import is subrogated to the rights and immunities of the importer; or whether the import, in the hands of such a purchaser, is liable to State taxation, so long as it remains in unbroken packages in the hands of such purchaser.   If not, then the appellee had the right to retain and sell the salt, in unbroken packages, free from State taxation.   But, whether he or the importer ·could be taxed on the money arising from the sales thereof, we will not consider, as this case can be disposed of without touching that question.—See opinion of Taney, C. J., in *License Cases*, 5 Howard.

These, and kindred questions, have frequently come under the consideration of the supreme court of the United States; and it is to be regretted that the members of that supreme tribunal have so often disagreed upon those questions, and have still left some of them in great perplexity, if not obscurity.   Without attempting the fruitless task of reviewing and reconciling those adjudications, we will content ourselves with a reference to those collated upon the briefs of the counsel in this cause, and with a few quotations from such as we prefer to follow, *upon the question before us.*

In the *License Cases*, (5 Howard, 574,) Taney, C. J., in his opinion, speaking of the question decided in the case of *Brown v. Maryland*, (12 Wheaton,) says: "When the commodity had passed from his" (importer's) " hands, into the hands of the purchaser, it ceased to be an import, or a

part of foreign commerce, and became subject to the laws of the State, and might be taxed for State purposes, and the sale regulated by the State, like any other property." This rule the chief-justice approved and adopted ; and I do not remember any case, in which its correctness has ever been judicially questioned. McLean, J., in his opinion in the same cases, says : " Under the decision of *Brown v. Maryland*, it is admitted that the license acts can not operate upon the right of the importer to sell. But, after the import shall have passed out of the hands of the importer, whether it remains in the original package or cask, or be broken up, it becomes mingled with other property in the State, and is subject to its laws." This rule was not questioned by any of the learned judges who delivered opinions in those vexed cases.

To entitle an import to exemption from State taxation, it must be in the hands or control of the importer, or his agent, in unbroken packages, or in the condition imported. If he breaks up the packages, and offers the contents for sale, they become liable, *even* in his hands, to State taxation. If he sells them in unbroken packages, under the authority of the *License Cases* and *Brown v. Maryland*, they are liable to State taxation in the hands of the purchaser. The appellee not being the importer of the salt sold by him, it was liable to State taxation ; and *a fortiori*, the proceeds of the sale thereof were liable.

It is unnecessary, under this view of the merits of the cause *upon the proof*, to consider the grounds of demurrer assigned against the equity of the bill, or the other questions argued so ably at the bar, and on printed arguments furnished the court by counsel.

From the view we take of this cause, the decree of the chancellor must be reversed, and a decree must be here rendered, dismissing the bill, at the costs of the appellee, in this, and in the court below.