## NEWBERRY v. CITY OF DETROIT.

1. TAXATION—SPECIAL ASSESSMENTS — VOLUNTARY PAYMENT—RECOVERY BACK—DETROIT CHARTER.

In an action for the recovery of taxes paid pursuant to a special paving assessment, plaintiff, who had paid the tax after it became a lien under the provisions of the charter of the city of Detroit providing that after confirmation of the assessment roll the assessment should constitute a lien upon the land, was not barred from recovery on the ground that her payment was a voluntary payment, and, having paid the assessment without a written protest, plaintiff was nevertheless entitled to recover back any illegal portion of the tax upon the ground that the payment was made under duress.

2. SAME—VOLUNTARY PAYMENT.

Where the owner of property pays a special assessment which has become a lien upon his premises, in order to relieve the real estate of the lien which has attached by virtue of special provisions of law, the payment is equivalent to one made under duress, since such lien is *prima facie* valid.

3. SAME—SPECIFIC PROTEST.

No rule of law requires a specific protest as a condition to recovering back taxes which have been paid involuntarily under a legal duress.

4. SAME—SPECIAL ASSESSMENT—PAVING TAXES.

Under the Detroit charter, a special assessment for purposes of paving, assessed according to frontage and containing an item of twenty cents per square yard as a part of the estimated cost for maintenance or protection against imperfect work covering a period of ten years after it was constructed, was valid, since the added expense for prospective maintenance was equivalent to and was shown to be approximately equal in amount to the cost of a guaranty against faulty or defective construction or material.

5. SAME—GUARANTY—BOND—CONTRACT.

The requirement of a bond to guarantee the performance of a paving contract is a lawful and valid requirement.

6. SAME—PROFIT—PAVING TAX.

*Held*, however, that an amount included in the assessment as estimated profits, which the evidence showed was placed to the credit of the municipal road fund and not used for the purposes of maintenance of the street or of an asphalt plant owned by the city, was unauthorized and illegally assessed, and that plaintiff could recover back the amount thereof which she had paid involuntarily.

Error to Wayne; Hally, J. Submitted November 11, 1914. (Docket No. 4.) Decided January 29, 1915. Rehearing denied April 28, 1915.

Assumpsit by Truman H. Newberry and another as executors of the estate of Helen H. Newberry, deceased, against the city of Detroit to recover back taxes paid under legal duress. Judgment for plain-

tiffs upon a verdict directed by the court.  Defendant brings error.  Reduced and affirmed.

*Walter Barlow (Richard I. Lawson,* of counsel), for appellant.

*Miller, Smith, Paddock & Perry,* for appellees.

The plaintiffs obtained a judgment for $7,105.57 upon a verdict directed by the court, as a part of certain paving taxes which it is claimed were illegally assessed against certain lots which were located on Chicago boulevard, Boston boulevard, and Calvert avenue, in the Voigt Park subdivision in the city of Detroit, and were owned in 1910 and 1911 by Helen H. Newberry, now deceased.  The streets in question had not been paved before, and the paving was done on petition of the owners of a majority of the foot frontage of the lots or parcels of land abutting said pavements.  The pavements were constructed by a private contractor, who was the lowest bidder for the work.  The city of Detroit, by its department of public works, maintains an asphalt plant, and at the time the city was advertising for proposals for paving the streets the commissioner of the department of public works of the city mailed to the several contractors who do public work of this character the following letter:

"To PAVING CONTRACTORS, DETROIT:
  Boston Boulevard ...........$1 30 per sq. yd.
  Chicago Boulevard .......... 1 30  "   "   "
  Calvert Avenue ............. 1 30  "   "   "
"*Gentlemen:* In reference to the advertisement now running in the Morning News for proposals for paving streets with sheet asphalt, I wish to state that this department stands ready to do the sheet asphalt, binder, and surfacing work at the prices shown above.
"There will be no maintenance guaranty required of the contractor if the city does the asphalt work, otherwise the guaranty provided for in the specifica-

tions will be required. Preserve this letter and attach it to your proposal if you bid on the asphalt streets above mentioned.

"Very truly yours,

"J. J. Haarer, Commissioner."

In the paving in question, all the asphalt work was done and the materials for the same were furnished by the department of public works at a price of $1.30 per square yard, and in each bid for paving these streets an item of $1.30 per square yard for the asphalt, binder course, and asphalt surface was included. In the specifications for sheet asphalt pavement on concrete foundation adopted by the common council of the city, there was the following:

"The contractor will furnish a ten-year guarantee of his work from the date of the acceptance of said work by the department of public works (without extra charge), the guarantee to be of such form and nature as the department of public works may direct."

But inasmuch as the city itself, by its department of public works, did the asphalt work on the pavements, in accordance with the letter above set forth, the contractor was not required to furnish the 10-year guaranty for his work required in the specifications. However, in the price of $1.30 per square yard charged by the city for the asphalt work, there was included an item of 20 cents, known as a "maintenance charge," and an item of .0753 per square yard, known as an "overhead" charge, and also an "estimated profit" item which on the whole work here involved amounted to $1,650.70. The "maintenance charge" was made to cover the 10-year guaranty of asphalt pavements required by the city from contractors by its specifications, and the estimated profit item represented the profits estimated to have been earned by the department of public works on these various jobs. No question is raised as to the validity

of the overhead charge. Of the asphalt work done on the streets in question there was $29,968.71 assessed against the property of Mrs. Newberry, and in this amount there was included a maintenance charge of $4,610.57, and an estimated profit of $1,650.70, the total of the two items, $6,261.27, constituting the principal sum of the plaintiffs' claim in this litigation. This amount, with interest, formed the basis of the judgment rendered in the lower court. These items in due course went into the city's general road fund, and Mr. Proctor, the city's asphalt expert, testified that these funds were used for the general purposes of the fund. Aside from including these two items in the various assessments, it is agreed that for the purposes of this case the assessments and the various assessment rolls were in all other respects legal and valid. An examination of the assessments and the assessment rolls failed to disclose that the assessments included the items of "maintenance charge" and "estimated profit." In the year 1911, after the assessment rolls had been confirmed by the common council of Detroit and had been delivered to the receiver of taxes for collection, Mr. F. S. Smith, who attended to these matters for Mrs. Newberry, paid to the receiver of taxes the entire amount of the assessments without protest, and no complaint was made by Mrs. Newberry or in her behalf prior to the time of payment, either to the board of assessors sitting as such board or as a board of review, or to the common council, or any committee thereof. In July of 1912 Mrs. Newberry presented her verified claim to the common council of the city for the recovery of the amount for which this suit is brought, which the common council refused to allow, and this litigation resulted.

KUHN, J. (*after stating the facts*). The claim is made that the payments of the assessments by Mrs.

Newberry was a voluntary payment, and for that reason no recovery by her can be had. The charter of the city of Detroit (1904 edition), chap. 11, § 37, provides in part, as to assessment rolls for paving:

"And when the same [assessment roll] shall be corrected to the satisfaction of said council it shall by resolution confirm the same. After such confirmation, such assessment shall constitute a lien until paid, upon said lots or parcels of real estate, and shall be collected in such manner as may be authorized by law."

The assessment roll then goes into the hands of the receiver of taxes, who causes notice of the assessment to be printed in two of the newspapers published in said city once in each week for three successive weeks. The assessment is divided into four parts, part 1 becoming due and payable in 30 days from the first publication of said notice, and parts 2, 3, and 4 becoming due and payable in one, two, and three years, respectively, from the date of the first publication.

The charter further provides that any person may pay the entire amount of the assessment within 30 days from the date of said publication without interest; but, if not paid within that time, the part remaining unpaid shall be payable with interest at the rate of 7 per cent., from the date of confirmation of said assessment until the same shall be paid, and if the amount of part 1 of the assessment is not paid within 30 days, a penalty of 5 per cent. in addition to the interest shall be added thereto and a like penalty to the other parts if not paid when due.

The entire amount of the paving taxes was paid by Mrs. Newberry. The record does not disclose the exact date of the payment, but it is to be assumed that they were paid before there was any liability for interest or penalty. It is clear from the charter pro-

vision that at the time the taxes were paid they had become a lien on the property. The question of whether or not a payment of taxes after having become a lien is a voluntary payment seems to have been definitely determined by this court in the case of *Thompson* v. *City of Detroit*, 114 Mich. 502 (72 N. W. 320). The tax or assessment in that case was for the opening and widening of a street, and was paid after confirmation by the council, and the tax had become a lien by virtue of the charter provision. The court in that case said (114 Mich. 506, 72 N. W. 321):

"While the tax was not paid under threat of levy upon personal property, yet we think that, it having been made for the purpose of relieving the real estate of the lien which had attached by virtue of the provisions of the charter, it was equivalent to a payment under compulsion. *Prima facie*, it was a valid lien upon the land."

It is true that in that case a protest was made at the time of the payment of the taxes, and the receiver of taxes thus had notice that the taxes were regarded as illegal. But when the payment of taxes is involuntary and made under legal duress, there is no rule requiring specific protest. *Cox* v. *Welcher*, 68 Mich. 263 (36 N. W. 69, 13 Am. St. Rep. 339); *Pere Marquette R. Co.* v. *City of Ludington*, 133 Mich. 397 (95 N. W. 417).

While good reasons may be advanced for questioning the wisdom of the rule thus established, a change with reference thereto, in our opinion, should now be sought in the legislature rather than in the courts. Therefore, in harmony with the ruling in the *Thompson Case* we conclude that a tax paid after a lien attaches to the property, because of it, must be held to have been paid under legal duress, and is not a voluntary payment.

The charter of the city of Detroit makes express

provision for the original paving of its streets, and requires the cost and expense of such an improvement (with certain unimportant deductions) to be assessed ratably according to frontage on the lots, parts of lots, and parcels of real estate fronting on the improvement, and further provides for the repairing and repaving of its streets out of a repairing and repaving fund, created and raised for such purposes by general taxation. In our opinion, the validity of that part of the tax complained of depends upon whether it can be said that the "maintenance charge" and "estimated profits" are legally any part of the cost and expenses of these improvements. The item of $.20 per square yard is an arbitrary figure, it seems, made from practical experience and from what contractors generally charge to keep pavements in repair, to cover the maintenance of the paving for 10 years. Mr. Proctor, who is the asphalt expert for the city of Detroit, testified with reference to this item, and also the overhead charge, as follows:

"*Mr. Perry:* And the item of 'Estimated Profits' goes in under the same subheading (asphalt patching), does it not?

"*Mr. Barlow:* Yes.

"*Mr. Perry:* And that item it is stipulated is used to maintain the asphalt plant?

"*The Witness:* Not at all. I don't agree with you on that. I do not think it goes to maintain the asphalt plant. We have a special appropriation, which was acted upon today by the common council committee. For instance, we put in an estimate what it would cost to maintain the asphalt plant. We do not call upon that fund for that purpose at all. We have special appropriations for various repairs and parts we may need for the asphalt plant proper. For instance, we ask for $6,000 for repairs and replacements. We ask for appropriations for a storage shed; we ask for $4,000 for apparatus for handling materials. Everything is specified as to what we want, and we get the money for it. We don't use that item to maintain the plant. That goes into the gen-

eral road fund, and I suppose anybody can get the benefit. I suppose the taxpayers will get it eventually. They are part of the department of public works, I think. It is a city department. In that way I have to dispute the fact that we repair our plant from this fund, the statement at least, not the fact.

"*Mr. Perry:* Well, I am willing to accept your amendment, but your counsel does not agree with you.

"*The Court:* Does it make any difference?

"*Mr. Perry:* I do not see what difference it makes. It is bad enough; that is all.

"*Mr. Barlow:* Mr. Proctor, what does this 20 per cent. for maintenance fund include? What kind of repairs?

"*A.* General repairs. Any damage caused to the pavement through poor workmanship and defective materials.

"*Q.* That is these particular streets? Paving of these particular streets in question?

"*A.* Any of the streets where I have charged for maintenance, any new paving or repaving, we charge 20 cents a yard, and my understanding of it is that we maintain those streets against disintegration of materials, for instance, for a period of 10 years. And I think from a business standpoint it is a proper charge, regardless of what others say.

"*Q.* What is the charge of 7 cents for overhead?

"*A.* Overhead includes my salary, depreciation of plant, 10 per cent. per annum, my superintendent's salary, our foreman, our repairs, renewals, and sundry expense items. I cannot go into everything.

"*Mr. Perry:* If I understand you, Mr. Proctor, the city puts in an item of 20 cents per square yard which its experience shows it will cover the cost of maintaining that pavement as it was through that period of 10 years.

"*A.* Not entirely so, simply estimated cost, charge for maintenance. That figure is a figure which we have set as a proper figure for the maintenance of the paving for 10 years. The figure is made from practical experience, from what I thought was right, and based on what is charged by contractors generally to keep the pavement in repair for 10 years.

"*Q.* It might conceivably happen, might it not,

that that charge of maintenance that you have made might all be gone, and yet the city not have done a penny's worth of repairs on that particular pavement?

"*A.* It is possible, yes. That would be to the credit of the asphalt department in the class of pavement they laid.

"*Q.* It would be very much to the detriment of Mrs. Newberry, would it not?

"*A.* No, sir; it would not. Mrs. Newberry could not get that pavement laid at the price under contract of $1.30 per square yard, if I may say so. I will tell you cases at the present time where contracts had been made with the Newberry estate for the continuation of those streets at $1.10 per square yard for 2½ inches of surface. I put in 3½ inches of surface for $1.30 per square yard. That would cost Mrs. Newberry at the lowest possible figure $1.41 per square yard for a 5-year guaranty. I give a 10-year guaranty for $1.30 per square yard. These are facts I can verify. I have the figures right here for you. I know where the Newberry estate has contracted for about 60,000 yards up in that vicinity within a week.

"*The Court:* Mr. Proctor, is this notion of mine a correct notion; that it does not make any difference how circumspect or careful you are when you are laying a piece of asphalt pavement, that trouble is apt to develop as a result of the work being done?

"*A.* Yes, sir; in a great number of cases, temperature, mesh composition of the sand. We are dealing with a material that comes in bulk, sand.

"*Q.* So that while you take the utmost care in the mixture and in the material that you put in, nevertheless to insure a permanent job you have to add to the actual cost a certain percentage or a certain amount for maintenance?

"*A.* I think so, your honor. Now, the city took a chance, on giving a figure, of putting in a figure of $1.30 per square yard."

We are of the opinion that the maintenance charge can properly be considered a part of the cost of the initial construction of the pavement, as it in effect amounts to a guaranty for 10 years of the workman-

ship and the materials used. The requirement of the city of a bond from the contractor guaranteeing the city for a period of 10 years against imperfect work or defective material in the construction of pavements is, in our opinion, a proper and legal requirement. The validity of requiring such a guaranty against imperfect original construction or faulty materials has generally been upheld by the courts, and Judge Dillon, in his treatise on Municipal Corporations, summarizes the law on this subject as follows:

"A common, if not the general, method of improving and maintaining streets imposes upon abutting proprietors the cost of paving, whilst the cost of ordinary repairs is imposed upon the city at large. Contractors for street paving, in their endeavor to induce municipal governments to adopt their pavements, make representations as to its character and durability, and it is proper that some remedy should be reserved to the municipality by which it can enforce their contracts and representations in this regard. Hence it has been a common custom to require from a contractor for paving a street a *guarantee that he will maintain it in repair* for a term of years. When such a stipulation is exacted, does it throw the cost of the repairs upon the abutting proprietors, who are to be assessed for the cost of the paving, contrary to the general scheme of the city's government, or is it a mere provision for the protection of the city against imperfect work? In pavements, particularly in asphalt, the durability depends very largely upon the character of the work, the condition of the foundation, and the mixture of the material used; and it is not difficult for contractors to deceive the inspectors in regard thereto. A guarantee on the part of the company as to the durability of the pavement affords a simple and complete remedy which fully protects the public, and when the time for which the guarantee continues is no longer than the ordinary durability of the pavement when laid with the best workmanship and material, it does not impose any unreasonable burden on the contractor. One view

declares that such guarantee does not contravene the provisions of a municipal charter requiring repairs to be made in the expense of the city at large. If the *repairs are limited to the making good imperfect work, or the defective material used,* no additional burden is imposed upon the abutting property owners, by reason of a requirement of a guarantee for a term of years. But some courts appear to *adopt a contrary view,* and hold that such a guarantee of necessity tends to increase the cost of the improvement and to impose upon an abutting proprietor the expense of repairs contrary to the charter provisions, and that a contract containing such a stipulation is invalid. It is to be observed of *these conflicting decisions that the difference in result* appears to arise rather from a difference of opinion as to the effect of the guarantee than from any disagreement as to the legal principle. The decisions which hold that such a guarantee is a proper provision for the protection of the municipality and does not impose the expense of repairs upon the abutting proprietors seem to recognize three features of the guarantee before the courts as controlling, viz.: That the contractor was not required to guarantee his work against any other defects than those for which he might properly be held responsible; that responsibility for defects arising from causes for which he was not responsible, as from acts of the city or its licensees in opening the street, was not imposed upon the contractor; and that the guaranty did not extend beyond such term of years as the pavement might naturally be expected to continue in good order. In some of the cases which have adopted the contrary view, the courts have relied upon the fact that the guarantee in question was in effect an agreement to keep the whole street in repair for a term of years, irrespective of the causes which might necessitate the repairs, or at least that it obligated the contractor to repair defects in the streets for which he was not responsible." 5th Ed., pages 1260-1262.

As the testimony shows that from the practical experience of contractors engaged in this kind of work it is found necessary to expend the amount of

this maintenance charge in keeping the pavement in repair for the stated period of 10 years, we see no reason why complaint should be made of the charge. In the instant case the charge for maintenance does not go further than would a requirement to guarantee against original faulty construction of defective material, and we, therefore, conclude that this charge was proper.

The same reasons, however, cannot be urged in support of the estimated profit charge. Mr. Proctor, in his testimony herein quoted, says that this item went into the general road fund, and was used just as other maintenance funds were used, and not especially to maintain the asphalt plant. So that it is clear that it could not be said to be a part of the cost and expenses of these improvements. It was therefore illegally assessed against the property, and the trial court properly directed a verdict as to this item, amounting to $1,650.70 and interest thereon. Therefore, unless plaintiff elects within 20 days to remit the sum of $4,610.57 and interest thereon from the judgment had herein in the court below, the judgment will be reversed and a new trial granted. If plaintiff does so remit, it will be affirmed.

BROOKE, C. J., and McALVAY, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.