[No. 26847. Department Two. May 3, 1938.]

THE STATE OF WASHINGTON, *Respondent,* v. FIDELITY & DEPOSIT COMPANY OF MARYLAND *et al., Appellants.*[1]

[1]Reported in 78 P. (2d) 1090.

*L. B. daPonte, Robert S. Macfarlane, Dean H. East-man,* and *Meier & Meagher,* for appellant Northern Pacific Railway Company.

*The Attorney General* and *R. G. Sharpe, Assistant,* for respondent.

ROBINSON, J.—This action was begun in January, 1936, against the Fidelity & Deposit Company of Maryland, by filing a complaint alleging, in substance, that the Sunset Pacific Oil Company, on June 4, 1935, procured a fuel and Diesel oil distributor's license under the provisions of Title XI, chapter 180, Laws of 1935, p. 749, Rem. Rev. Stat. (Sup.), § 8370-78 [P. C. §7030-138] *et seq.,* and filed a bond with the defendant as surety, conditioned, as required by the act, to pay plaintiff any taxes which might become due from it as such distributor, and that the oil company, on September 9th, "imported into the state of Washington 29,712.6 barrels of fuel oil," which it sold and delivered to the Northern Pacific Railway Company at Tacoma, but failed to pay the tax imposed by Title XI of chapter 180, amounting to the sum of $3,119.82, for which amount plaintiff prayed judgment against the defendant surety.

In December, 1936, the plaintiff filed an amended complaint making the Sunset Pacific Oil Company, the Sunset Oil Company, and the Northern Pacific Railway Company additional defendants. In this complaint, which is the complaint upon which the case was tried, it was alleged that the Sunset Oil Company owned all the stock of the Sunset Pacific Oil Company, and that both had qualified as distributors, with the defendant Fidelity & Deposit Company of Maryland as surety upon the qualifying bonds in each instance; that the railway company, having large tanks at Tacoma and "desiring to avoid the payment of fuel oil

tax to the plaintiff," on August 2, 1935, entered into a written agreement with the Sunset Pacific Oil Company in which the railway company contracted to buy, and the oil company contracted to sell, large quantities of fuel oil; that, pursuant to such contract, on or about September 7, 1935, the Sunset Pacific Oil Company sold to the railway company 29,712.6 barrels of fuel oil which was shipped from San Pedro, California, via S. S. Topila, and delivered into the tanks of the railway company at Tacoma; and

". . . that said oil was at all times prior to the actual delivery to the Northern Pacific Railway Company, at the risk of the Sunset Pacific Oil Company, and payment therefor was not made until after delivery."

Plaintiff further alleged that both the oil company and the railway company refused to pay the distributor's tax imposed by § 78, chapter 180, Laws of 1935, p. 749, Rem. Rev. Stat. (Sup.), § 8370-78 [P. C. § 7030-138]; that, if the oil company was, in fact, taxable, it was subject to penalties provided in that act for failure to make proper reports and payment; and, if the railway company was taxable, it was subject to certain penalties for failure to qualify as a distributor and make reports and payment. Judgment was asked for $3,119.82 and the appropriate penalties against such defendants as the court might adjudge legally liable for the tax.

The defendants, answering jointly and severally, denied that the contract to sell and the sale were made to avoid the tax, and that a tax was due from any of them. They further denied that the oil company was a distributor as to the shipment in question within the meaning of the taxing statute and asserted that it brought the oil into the state in pursuance of its right to freely engage in interstate commerce. They also

denied that the railway company was a distributor within the meaning of the statute, setting up that it did not import the oil, but purchased it after it had been imported. They further alleged that the railway company used the oil solely in its interstate commerce operations and was not taxable in any manner with respect to the said shipment. The defendants invoked, as against the .asserted tax liability, the protection of clause 3, .§ 8, and clause 2, § 10, of Art. I of the constitution of the United States, the equal taxation provisions of the fourteenth amendment to the constitution of the state of Washington, and the due process and equal protection clauses of the fourteenth amendment to the constitution of the United States, and, as against the claimed penalties, the fourteenth amendment to the Federal consitution, and § 3 of Art. I of the state constitution.

The court found the facts substantially as alleged in the complaint, concluded that the railway company imported the oil into the state and stored the same, and withdrew it from time to time for use in connection with its business; and that it was, therefore, liable for the tax, but should not be subjected to penalties. It accordingly entered judgment against the railway company for $3,119.82 and costs, and dismissed the action as against the other defendants, with prejudice.

The railway company brings this appeal from the judgment against it, and the first question presented is whether or not it was, in fact, a distributor within the meaning of the statute.

Although Title XI, which includes §§ 78 to 81, inclusive, of chapter 180 of the 1935 Laws of Washington, is captioned "Fuel Oil Tax," it is clear from the terms of § 78, p. 749, that the tax therein provided for is not a tax on fuel oil, but an excise tax imposed upon persons with respect to the privilege of dis-

tributing fuel oil, such tax being measured by the amount of the fuel oil distributed. The state, therefore, had the burden of proving that the railway company was, in fact, a distributor as to the fuel oil in question.

It appears upon analysis of § 79 of the act, p. 750, Rem. Rev. Stat. (Sup.), § 8370-79 [P. C. § 7030-139], that three classes of distributors are taxed, namely: (a) persons who refine, manufacture, produce, or compound fuel oil *and* sell, distribute it, or in any manner use the same within the state; (b) persons who *import* any fuel oil *into* the state, *and* store, sell, withdraw, distribute, or in any manner use the same within the state; (c) persons who, having acquired fuel oil in original packages or containers, distribute or sell the same, whether in the original package or container or otherwise, or in any manner use the same.

It is obvious that, under the facts pleaded, proved, and found, the railway company cannot be included under (a) or (c), nor can it be included under (b), unless, in addition to storing and using the oil, it imported it into the state. The question is, therefore, reduced to this: Did the railway company import the oil?

The word "import," when used as a verb, means, by derivation, "to bear or carry into," and by common usage, "to bring in." In its technical meaning, it is usually employed to designate the bringing in of articles from a foreign country. In this statute, it evidently means the bringing into the state of fuel oil from any place without the state. A person who "imports" fuel oil into the state is one who brings fuel oil into the state.

No case has been cited to us, nor have we found any, which we consider absolutely determinative as to whether or not the railway company was an im-

porter of the fuel oil in question, but there are one or two cases which point to the solution of the matter. In 1867, the city of Mobile exacted a sales tax as to all sales made within its limits. One Waring was accustomed to make contracts to buy salt from vessels bound to Mobile before they came up the bay to the custom house, and, in some cases, while they were still at sea. He sold the salt in the original packages throughout the city of Mobile. He contested the right of the city to collect a sales tax with respect to such sales, claiming the protection of the decision of the supreme court of the United States pronounced by Chief Justice Marshall in the celebrated case of *Brown v. Maryland,* 12 Wheat. (25 U. S.) 419, 6 L. Ed. 678, in which it was held that an *importer* might sell (in original packages), free from all state interference. It appeared, however, during the trial of the case, that Waring's contracts to purchase invariably contained a stipulation that the salt should not be at his risk until actually delivered. The supreme court of Alabama held, since he did not take title until delivery, and, therefore, not until the importation had been accomplished, that he did not import the salt and was not an importer. *Mayor & Aldermen of Mobile v. Waring,* 41 Ala. 139. In affirming the case on appeal and holding that the question turned upon who was the owner of the salt when it was brought in, the supreme court of the United States said, in part:

"Whether the contracts to purchase were made before or after the vessel arrived in the bay is quite immaterial, as the agreement was, that the risk should continue to be in the owner or consignees until they delivered the salt into the complainant's lighters, alongside of the vessel." *Waring v. The Mayor,* 75 U. S. (8 Wall.) 110, 19 L. Ed. 342.

In the case of *King v. McEvoy,* 86 Mass. (4 Allen) 110, it was necessary for the plaintiff to establish that

he was the importer of a pipe of palm tree gin. One Wilson had brought the gin into the state and stored it in a bonded warehouse. He mortgaged it to plaintiff, who foreclosed the mortgage and paid the duty, and thus secured title and possession. The court said:

"But upon these facts we cannot regard the plaintiff as the importer, . . . To import an article is to bring it into the country from abroad. This act had been wholly performed by Wilson."

It accordingly held that Wilson was the importer and that King was not.

In this case, as we have seen, the fuel oil was, by contract, at the risk of the oil company until it was delivered into the railway company's tanks at Tacoma, and the act of importation was wholly performed by the oil company before the railway company got any title whatever to the oil.

The definitions of "a contract to sell" and "a sale," as given in the uniform sales act, Rem. Rev. Stat., § 5836-1 [P. C. § 6227-1], require us to take the following view of the transaction between the oil company and the railway company: The oil company agreed, in the contract of August 2nd, to bring fuel oil into the state of Washington and to there transfer title (that is, to there sell it) to the railway company at Tacoma. It is admitted that the oil in question was brought into the state by the oil company and was there sold to the railway company, just as the contract contemplated. We, therefore, hold that the oil company, and not the railway company, imported the oil. Accordingly, the railway company does not fall within any of the classes of persons which the statute makes subject to the tax; for, although it stored and used it, it did not import *and* store, etc. Having arrived at this conclusion, it is unnecessary to pass upon the constitutional questions raised by the pleadings.

The judgment appealed from is reversed, and the trial court is directed to dismiss the action.

STEINERT, C. J., BEALS, and MILLARD, JJ., concur.

BLAKE, J. (dissenting)—I dissent. I think the facts bring the case within the rule laid down in *Wiloil Corp. v. Pennsylvania*, 294 U. S. 169, 79 L. Ed. 838, 55 S. Ct. 358.

[1]Reported in 78 P. (2d) 1087.