[No. 27519. Department Two. September 1, 1939.]

GREAT NORTHERN RAILWAY COMPANY, *Respondent*, v. THE STATE OF WASHINGTON, *Appellant*.[1]

[1]Reported in 93 P. (2d) 694.

*The Attorney General* and *John E. Belcher, Assistant,* for appellant.

*Thomas Balmer, Edwin C. Matthias,* and *Anthony Kane,* for respondent.

MILLARD, J.—Section 78, chapter 180, Laws of 1935, p. 749, imposes a tax on each distributor of one-fourth of one cent for each gallon of fuel oil "sold, distributed, withdrawn or used by him." Section 1 (amendatory

of § 78, chapter 180, Laws of 1935), chapter 116, Laws of 1937, p. 459 (Rem. Rev. Stat. (Sup.) § 8370-78 [P. C. § 7030-138]) imposes a tax on each distributor of one-fourth of one cent for each gallon of fuel oil "sold, distributed, or withdrawn by him." The only change in the 1935 statute by the 1937 enactment was to discontinue the tax on use. Subdivision (c), § 79, chapter 180, Laws of 1935, p. 750, defines the term "distributor" and divides distributors into three classes, for purpose of taxation under the act, as follows:

"The word 'distributor' shall mean and include [1] every person who refines, manufactures, produces or compounds fuel oil and/or diesel oil and sells, distributes, or in any manner uses the same in this state; also [2] any person who imports any fuel oil and/or diesel oil into this state and stores, withdraws, sells, distributes, or in any manner uses the same in this state whether in the original package or container in which it is imported or otherwise; also [3] any person who having acquired in this state in the original package or container fuel oil and/or diesel oil, shall distribute or sell the same, whether in such original package or container in which the same was imported or otherwise, or in any manner uses the same; . . ."

Subdvision (c), § 79, chapter 180, Laws of 1935, was amended by subd. (b), § 2, chapter 116, Laws of 1937, p. 459 (Rem. Rev. Stat. (Sup.), § 8370-79 [P. C. § 7030-139]). It added the word "withdraws" after the word "sells" in the first class of distributors named in the definition and omits the phrase "or in any manner uses." No change was made in the second and third classes of distributors named in the definition.

Section 1, chapter 186, Laws of 1939, p. 581, imposes a tax on each distributor of one-fourth of one cent for each gallon of fuel oil "withdrawn, sold, distributed or in any manner used by such distributor." This amendment restores the tax on use discontinued by § 1, chap-

ter 116, Laws of 1937, which amended § 78, chapter 180, Laws of 1935.

Subdivision (a), § 2, chapter 186, Laws of 1939, p. 581, amendatory of subd. (b) § 2, chapter 116, Laws of 1937, and subd. (c), § 79, chapter 180, Laws of 1935, defines the term "distributor" and divides distributors into three classes, for purpose of taxation under the act, as follows:

" 'Distributor' shall mean and include [1] every person, firm, association or corporation who refines, manufactures or compounds liquid or liquefiable petroleum products, and withdraws, sells, distributes, or in any manner uses the same in this state; also [2] any person, firm, association or corporation who acquires the same within the state from any person refining it within or importing it into the state on which the tax of one-quarter (¼) cent per gallon has not been paid; or [3] any person, firm, association or corporation who imports the same into this state and withdraws, sells, distributes or in any manner uses the same in this state."

The 1939 enactment restores the phrase "or in any manner uses" to the first class of distributors named in the definition in the 1935 act and omitted from the 1937 amendatory statute. The second class of distributors named in the definition in the 1935 and 1937 statutes is made the third class in the 1939 enactment, which omits the word "stores" and the clause "whether in the original package or container in which it is imported or otherwise." By the 1939 statutory definition of the second class of distributors, a third classification (not so restricted as the third class of distributors named in the definition in the 1935 and 1937 statutes) is made. This group of distributors comprises those who acquire fuel oil within this state from any person refining fuel oil within or importing it into the state if the tax on such fuel oil has not prior thereto been paid.

The penalty provisions of chapter 58, Laws of 1933, p. 298, were adopted (doubtless to compel those engaged in selling, withdrawing, distributing, and using fuel oil to take out a distributor's license and pay the tax imposed by Title XI, chapter 180, Laws of 1935, p. 749, chapter 116, Laws of 1937, p. 459, Rem. Rev. Stat. (Sup.) § 8370-78 [P. C. § 7030-138] *et seq.*) as a part (§ 81, chapter 180, Laws of 1935, p. 751; § 4, chapter 116, Laws of 1937, p. 461, Rem. Rev. Stat. (Sup.), § 8370-81 [P. C. § 7030-141]) of the 1935 and 1937 statutes.

Section 8, chapter 58, Laws of 1933, p. 306 (Rem. Rev. Stat. (Sup.), § 8327-8 [P. C. § 7068-78]), provides that a fuel oil tax shall be paid monthly; that, if a person acts as a distributor "without first securing the license required by section 3," he shall pay a penalty amounting to one hundred per cent of the tax. If the sworn monthly statement required by § 7 of the act, p. 306 (Rem. Rev. Stat. (Sup.), § 8327-7 [P. C. § 7068-77]), is not filed by the distributor, a penalty amounting to ten per cent is added to the tax due. If the tax is not paid by the distributor by five p. m. on the fifteenth day of the next month after the tax becomes due, the distributor is subject to another penalty of ten per cent. All of the penalties are cumulative, and "no action taken pursuant to this section shall relieve in any wise any person from the penal provisions of this act."

Section 9 of chapter 58, Laws of 1933, p. 307 (Rem. Rev. Stat. (Sup.), § 8327-9 [P. C. § 7068-79]), provides that, if any distributor is delinquent in the payment of his excise tax under the act, notice of the amount of such delinquency shall be given by the director of licenses "to all persons having in their possession or under their control any credits or other personal property belonging to such distributor," and such persons so notified shall withhold the payment of such credits,

etc., to the taxpayer to protect the state in the collection of the tax. Such taxes, penalties, and interest constitute a lien in favor of the state upon all franchises, property, and rights to property, whether real or personal (whether such property is employed by such person in the prosecution of his business or otherwise) from the date the taxes are due and payable until paid. If the distributor is in default for more than ten days, the director is authorized to issue a warrant to the sheriff of any county of the state commanding the sheriff to levy upon and sell the goods and chattels of such distributor, without exemption, found within his jurisdiction, for the payment of the amount of the delinquency, with the added penalties, etc., and to proceed with the sale "with like effect and in the same manner as prescribed by law in respect to executions issued against goods and chattels upon judgment by a court of record."

In addition to the foregoing self-executing provisions undoubtedly designed to compel obedience without resort to the courts, §§ 19 and 22 of chapter 58, Laws of 1933, pp. 323, 326 (Rem. Rev. Stat. (Sup.), §§ 8327-19, 8327-22 [P. C. §§ 7068-89, 7068-92]), provide that any person, firm, association or corporation "or any officer or agent thereof failing to pay the tax as herein provided, or violating any of the other provisions of this act," shall be punishable by a fine of from five hundred to five thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment. The state highway patrolmen are authorized to arrest "on view, without writ, rule, order or process, any person known to have violated any of the provisions of this act."

Prior to the enactment of the fuel oil tax statute, plaintiff used fuel oil for the generation of steam in its locomotives in the operation of its railroad as a common

carrier of commerce in the state of Washington and adjacent states. On December 20, 1929, plaintiff entered into the first contract pertinent to the case at bar for the purchase of California fuel oil from the Associated Oil Company. The contract recites the purpose was to obtain a dependable supply of fuel oil for the operation of plaintiff's trains west of Whitefish, Montana.

The contract of December 20, 1929, was for

". . . the period beginning on January 1, 1931, and ending on December 31, 1933, deliveries to be made in fairly equal monthly installments, all the fuel oil up to and not exceeding a total during each year of 2,300,000 bulk barrels of 42 U. S. gallons each, required by Buyer during said period for current fuel oil purposes in the operation of its lines of railway west of Whitefish, Montana; provided that Buyer shall purchase hereunder not less than 1,800,000 bulk barrels of fuel oil during each year of said period."

A similar provision is in the contract executed August 16, 1935. By supplemental agreement of September 14, 1931, the term of the contract of December 20, 1929, was extended to December 31, 1935. The fuel oil involved in the case at bar, between May 1, 1935, to December 31, 1935, was sold and delivered under the terms and conditions of the contract of December 20, 1929. A new contract, in all particulars important to this case the same as the preceding contract, was executed August 16, 1935, for the period January 1 to December 31, 1936. That contract was continued in force for the period ending December 31, 1938, by letter contract of June 10, 1936. The fuel oil involved in this case from and after January 1, 1936, was sold and delivered to plaintiff under the terms of the contract of August 16, 1935.

The pertinent provisions of the contract executed December 20, 1929, are as follows:

"Buyer agrees to give Seller at least thirty (30) days' written notice of any deliveries of oil required hereunder. Said oil shall be delivered into the tanks of Buyer at Everett, Washington, where Buyer shall furnish suitable wharf and docking facilities and pipe lines and tanks for receiving said oil promptly, and shall furnish berth where Seller's vessels drawing not more than thirty (30) feet may navigate to, lie at, and depart from, safely at all stages of the tide. Said oil is to be delivered at Seller's risk as far as ship's rail only, in tank ship lots of from Sixty Thousand (60,000) to One Hundred Thousand (100,000) barrels, at Seller's option. . . .

"All pipe lines from said tank or tanks to the vessel shall be full when pumping begins and the lines shall have no open connections other than to the tank or tanks to which the oil is being delivered during time of unloading or between opening and closing gauges. Notwithstanding Seller's agreement to deliver said oil into Buyer's tanks, it is agreed that any loss of oil from Buyer's pipe lines between the ship's rail and the Buyer's tanks, or from the Buyer's tanks, due to bursting, breaking or leaking of such pipe line or hose or tanks or connections, or failure to close and keep closed all connections other than to the tank or tanks to which the oil is being delivered, shall be borne by Buyer. In case of any such loss the quantity thereof shall be determined by measurements of ship's tanks, and Buyer shall pay Seller for such quantity as though same had been delivered into the tanks. . . .

"Quality of oil delivered hereunder shall be determined by test of running line sample secured from vessel's discharge line continuously during the discharge of cargo. . . .

"Buyer is obligated to receive the oil upon vessel's readiness to discharge at minimum rate of Twenty-five Hundred (2500) barrels per hour, provided the vessel is able to pump at that rate. In the event of failure of Buyer so to do, the Buyer shall pay the Seller demurrage on the vessel AT THE RATE of Fifty Dollars ($50.00) per hour, In the event of Buyer's failure to receive the oil as stipulated above due to breakdown of Buyer's plant or machinery or due to fire or other cause

beyond Buyer's control, the rate of demurrage shall be Twenty-five Dollars ($25.00) per hour.

"Buyer agrees to pay seller at office of Seller in San Francisco, California, located at 79 Montgomery Street, in current moneys of United States of America for each bulk barrel of 42 U. S. gallons of oil delivered hereunder, . . ."

The provisions of the contract of August 16, 1935, material to this case, read as follows:

"Buyer shall give Seller at least thirty (30) days' written notice of any deliveries required hereunder.

"Said oil shall be delivered into Buyer's tanks at Everett, Washington, in tank ship lots of from Sixty Thousand (60,000) to One Hundred Thousand (100,000) barrels, at Seller's option. . . .

"Buyer shall furnish safe berth for discharging, and shall receive delivery from said vessel, at the said point of destination, or as near thereto as said vessel may, at any stage of the tide, proceed to, lie at, discharge, and depart from, always safely afloat, when draft does not exceed 30 feet. Buyer shall furnish berth at said point free of all charges. . . .

"In receiving deliveries Buyer shall render all necessary assistance and shall provide adequate facilities and equipment to receive oil at the rate of not less than 3,000 barrels per running hour at port of discharge. Steam for making deliveries shall be furnished by Seller's vessel, but if port regulations or other causes beyond Seller's control prohibit or prevent maintenance of fires under its boilers, Buyer, at its expense, shall furnish shore steam at a pressure of not less than 100 pounds per square inch at vessel's pumps. If delivery is not received within the aforementioned period, and if said vessel, unless prohibited or prevented as aforesaid, has maintained an average pressure of 65 pounds on the shore line at the point nearest the vessel's discharge connection, it shall be conclusive evidence that the vessel's facilities were capable of making delivery within said specified period, and that the facilities and equipment provided by Buyer were insufficient to receive delivery within said specified period. . . .

"Seller's title to, and responsibility and risk for, said oil shall cease when and as same passes ship's rail at point of discharging. Buyer shall be responsible for all of said oil lost through leakage, breakage, or defect in discharge hose, shore lines, tanks or connections. In case of any such loss the quantity thereof shall be determined by measurements of ship's tanks and Buyer shall pay Seller for such quantity as though same had been delivered into the tanks. . . .

"All pipe lines from said tank or tanks to the vessel shall be full when pumping begins and the lines shall have no open connections other than to the tank or tanks to which the oil is being delivered during time of unloading or between opening and closing gauges. Notwithstanding Seller's agreement to deliver said oil into Buyer's tanks, it is agreed that any loss of oil from Buyer's pipe lines between the ship's rail and the Buyer's tanks, or from the Buyer's tanks, due to bursting, breaking or leaking of such pipe line or hose or tanks or connections, or failure to close and keep closed all connections other than to the tank or tanks to which the oil is being delivered, shall be borne by Buyer. In case of any such loss the quantity thereof shall be determined by measurements of ship's tanks, and Buyer shall pay Seller for such quantity as though same had been delivered into the tanks.

"The quality of oil delivered hereunder shall be determined by test of composite sample secured from discharge line during the discharge of cargo. . . .

" . . . To insure that all of the oil remaining in the discharge line from previous delivery is displaced, the first sample shall be taken one-half hour after the vessel commences to discharge.

"Payments hereunder shall be made in lawful money of the United States of America. Buyer shall pay Seller at Seller's office in San Francisco, California, for each bulk barrel of oil delivered. . . ."

The negotiations culminating in the execution of the foregoing fuel oil contracts were conducted in Minnesota between representatives of the oil company and plaintiff. The contracts were prepared by attorneys

of the respective companies in Minnesota and California and were executed and delivered in the state of California and the state of Minnesota. Each month, in payment for oil delivered during the preceding month, plaintiff's treasurer, in St. Paul, Minnesota, transmits a check to the oil company's offices at San Francisco, California.

Plaintiff maintains at a point on its main line of railroad, adjacent to Puget sound, known as Mile Post 31, at Everett, Washington, three stationary tanks, which are at a slight elevation above high tide and have a capacity of 165,000 barrels. A pipe line, which has an additional storage capacity of six thousand gallons, extends from the storage tanks to and along a timber wharf projecting into Puget sound.

The fuel oil delivered to plaintiff under the above-described contracts was loaded by the oil company into tank ships owned (or chartered) and operated by the oil company and transported by the oil company in those tank ships by way of the Pacific ocean, the strait of Juan de Fuca and Puget sound, to and alongside plaintiff's wharf at Mile Post 31, on Puget sound, in Everett, Washington. When the tank ships arrived at Mile Post 31, delivery of the oil to the plaintiff was by the oil company through a short discharge hose supplied by the oil company, which hose was connected to and extended from the deck outlet of the ship's tanks, over the ship's rail, to the end of plaintiff's pipe line on plaintiff's wharf. The valves at the deck outlet and at the end of plaintiff's pipe line were then opened and the oil was pumped from the hold of the tank ship through the discharge hose into plaintiff's pipe line and storage tanks. The ship, as required by the contracts between plaintiff and the oil company, at all times supplied the power to run the pumps.

On completion of delivery of the oil, the valve at the

wharf end of plaintiff's pipe line was closed and the discharge hose back-pumped by the ship in order to remove all oil from the discharge hose. The contracts provide that all pipe lines from the storage tanks to the vessel are to be full, when pumping begins. Under the method employed by the oil company and the plaintiff in delivery and storage of the fuel oil, the pipe line, to the full extent of its capacity of six thousand gallons, was used for the storage of oil from the delivery of one ship-load until the delivery of the next ship-load. Plaintiff did not have anything whatever to do with the operation of the tank ships or with the delivery of the oil, and did not come into possession or control of the oil until it passed the ship's rail into plaintiff's pipe line. After its receipt in plaintiff's storage tanks and pipe line at Mile Post 31, at Everett, Washington, the fuel oil purchased by plaintiff from the oil company under the contracts in question was withdrawn and used by plaintiff in the operation of its trains.

In June, 1935, the plaintiff was granted a license authorizing it to engage in business as a distributor of fuel oil under the provisions of chapter 180, Laws of 1935. July 1, 1936, the license was renewed for one year, expiring June 30, 1937. On June 17, 1937, the license was again renewed to expire June 30, 1938. Subsequently, counsel for plaintiff surrendered the license to the director of licenses.

Plaintiff punctually made, without protest, required monthly payments of distributor's fuel oil tax aggregating $206,789.70 on 82,715,887 gallons of oil sold and delivered to it under the contracts in question for the period May 1, 1935, to March 31, 1937. Remittances for the taxes, amounting to $17,517.42 on 7,006,970 gallons of fuel oil, were made, under written protest, for the months of April and May, 1937. The director of licenses agreed to permit plaintiff, and not enforce penal

provisions of the fuel oil statute, to defer future payments of the distributor's fuel oil tax until disposition of appeal in *State v. Fidelity & Deposit Co. of Maryland,* 194 Wash. 591, 78 P. (2d) 1090, which raised the question whether a railroad company under facts like those in the case at bar was subject to the distributor's fuel oil tax as an importer. We reversed the judgment and held that the railroad company did not import the oil, therefore was not subject to the tax.

Promptly thereafter, on the ground that, although not made under written protest, the payments were involuntarily made as the moneys were paid to the state under duress, business compulsion, and coercion arising out of the penalty provisions of Title XI, chapter 180, Laws of 1935, chapter 116, Laws of 1937, and chapter 58, Laws of 1933, plaintiff instituted its first cause of action to recover against the state fuel oil taxes paid for the period from May 1, 1935, to March 31, 1937. In its second cause of action, plaintiff seeks to recover payments made under written protest of fuel oil taxes for the months of April and May, 1937.

The state answered, defending its right to retain fuel oil taxes paid by plaintiff from May 1, 1935, to May 31, 1937, and by cross-complaint sought recovery of taxes alleged to have accrued between June 1, 1937, and September 30, 1938, payment of which was withheld pending disposition of appeal in *State v. Fidelity & Deposit Co. of Maryland, supra.*

Trial of the cause to the court, sitting without a jury, resulted in findings of fact and conclusions of law in favor of the plaintiff. Judgment awarding recovery to plaintiff on its two causes of action and dismissing the cross-complaint was entered. Defendant appealed.

Counsel for appellant contend that respondent was the importer of the fuel oil in question, that respondent stored the oil in this state and thereafter withdrew it

from storage and used it in this state; therefore, respondent is subject to taxation as a distributor under that subdivision of § 79, chapter 180, Laws of 1935, and that subdivision of § 2, chapter 116, Laws of 1937, defining a distributor as any person who imports any fuel oil into this state and stores, withdraws, or in any manner uses the same in this state, whether in the original package or container in which it is imported or otherwise. In the event that we do not agree that respondent was the importer of the oil, counsel for appellant insist that respondent is subject to the tax as a "distributor" under the third subdivision of § 79, chapter 180, Laws of 1935, and the second subdivision of § 2, chapter 116, Laws of 1937, which defines and classifies as a distributor any person who acquires the oil in this state in the original package or container and thereafter stored, distributed, or used the oil in this state.

Counsel for respondent insist on appeal, as they argued in the trial of the action,—with which position the trial court was in accord—that the facts surrounding the purchase by, delivery to, and use of fuel oil by the Northern Pacific Railway Company in *State v. Fidelity & Deposit Co. of Maryland,* 194 Wash. 591, 78 P. (2d) 1090, were the same in every material respect as the facts surrounding the purchase by, delivery to, and use of fuel oil by respondent in the case at bar; therefore, any question as to the liability of respondent for the tax as a fuel oil distributor under chapter 180, Laws of 1935, and chapter 116, Laws of 1937, is foreclosed by our opinion in the case cited.

The facts in *State v. Fidelity & Deposit Co. of Maryland, supra,* are, substantially, the same as the facts in the case at bar. In that case, counsel for appellant railway company argued as follows:

"The definition of 'distributor,' in § 79, is in three parts, viz:

"(a) Every person who refines, manufactures, produces, or compounds fuel oil and *sells,* distributes or in any manner uses the same in this state.

"(b) Also any person who *imports* any fuel oil into this state *and* stores, withdraws, sells, distributes or in any manner uses the same in this state whether in the original package or container in which it is imported or otherwise.

"(c) Also any person who having acquired in this state in the *original package or container* fuel oil, shall distribute or sell the same, whether in such original package or container in which the same was imported or otherwise, or in any manner uses the same.

"Obviously, neither (a) nor (c) apply here. (a) means one who refines and sells or uses in the same state. (c) applies to the acquisition in the state of oil in the original package or container; for instance, a tank car, and sale or use in the state. The oil in question was not acquired in this state in the original container.

"The portion of the definition of a distributor on which the state must rely and on which the trial court must have based its opinion is (b), applying to one who *'imports and stores,* withdraws, sells, distributes or in any manner uses . . . in this state.' "

The original package doctrine advanced by counsel for the state in the case at bar was not urged by counsel for the state in the case cited. It is plain that the parties (the state and the railway company) were of the view that the answer to the question whether the railway company was an importer of fuel oil would be determinative of the question whether the railway company was subject to the tax as a distributor.

We held that, under the fuel oil tax statutes defining three classes of distributors, one of which is (b) persons who import fuel oil into the state and store, sell, withdraw, or use the same, a railroad company is not subject to the tax as an importer where its contract with the oil company required the oil company to bring

a large quantity of fuel oil into the state and deliver it into the railroad company's tanks at Tacoma, the fuel oil to be at all times subject to the risk of the oil company until the act of importation was wholly performed, when the oil was then sold and payment made for same.

The only question presented in that case was whether the railroad company imported the fuel oil. This is clear from a reading of the opinion, the pertinent language of which is as follows:

"It appears upon analysis of § 79 of the act, p. 750, Rem. Rev. Stat. (Sup.), § 8370-79 [P. C. § 7030-139], that three classes of distributors are taxed, namely: (a) persons who refine, manufacture, produce, or compound fuel oil *and* sell, distribute it, or in any manner use the same within the state; (b) persons who *import* any fuel oil *into* the state, *and* store, sell, withdraw, distribute, or in any manner use the same within the state; (c) persons who, having acquired fuel oil in original packages or containers, distribute or sell the same, whether in the original package or container or otherwise, or in any manner use the same.

"It is obvious that, under the facts pleaded, proved, and found, the railway company cannot be included under (a) or (c), nor can it be included under (b), unless, in addition to storing and using the oil, it imported it into the state. The question is, therefore, reduced to this: Did the railway company import the oil?

". . . the oil in question was brought into the state by the oil company and was there sold to the railway company, just as the contract contemplated. We, therefore, hold that the oil company, and not the railway company, imported the oil. Accordingly, the railway company does not fall within any of the classes of persons which the statute makes subject to the tax; for, although it stored and used it, it did not import *and* store, etc."

Chapter 186, Laws of 1939, p. 581 (cited and quoted above), amendatory of chapter 180, Laws of 1935, and

chapter 116, Laws of 1937, reflects acceptance by the legislature of *State v. Fidelity & Deposit Co. of Maryland,* 194 Wash. 591, 78 P. (2d) 1090, as determinative of the question whether, under facts (which are substantially the same as in the case at bar) of that case, the purchaser of the fuel oil is an importer, and also the question whether such purchaser was a distributor, as having acquired the oil in this state in the original package or container.

In its petition for rehearing, which was denied, the state contended, for the first time, that the Northern Pacific Railway Company was a distributor under the third subdivision of § 79, chapter 180, Laws of 1935, as the railway company acquired the oil in this state in the original package or container. Under our decision (*State v. Fidelity & Deposit Co. of Maryland,* 194 Wash. 591, 78 P. (2d) 1090) which was expressly confined to the only question (which we answered in the negative) raised by the parties, Did the Northern Pacific Railway Company import the oil? the question presented in the case at bar whether respondent is an importer of fuel oil is foreclosed and must be answered in the negative. However, the denial of the petition for a rehearing challenging, for the first time, our attention to the original package doctrine, did not foreclose the question whether, under the third subdivision of § 79, chapter 180, Laws of 1935, one who acquires fuel oil in this state in the original package or container, etc., is subject to the tax as a distributor.

In support of the position that respondent acquired fuel oil in the original package or container and distributed and used the same in this state, therefore is subject to the fuel oil tax as a distributor, counsel for the state cite *West Virginia & Maryland Gas Co. v. Towers,* 134 Md. 137, 106 Atl. 265, in which the Maryland court of appeals held that an article imported is

not protected, by the provisions of the United States constitution relating to interstate commerce, from the interference of state laws when the original package has been sold by the importer or broken up by him or has otherwise become mixed with the common mass of property in the state. The court stated that the term "original package," as used in cases involving interstate commerce, may apply to articles incapable, by reason of their physical properties, of assuming the form of a package, therefore the term "original package" means the form or physical condition of the article in which it is transported in its interstate movement, hence natural gas transported from one state to another state in pipe lines may fall within the term. The original package of gas is broken when the first gas is taken out of the pipe lines and sold in the state in which delivery is made, and the gas thereafter ceases to be an article of interstate commerce. Patently, that case is not in point.

Neither is *Askren v. Continental Oil Co.*, 252 U. S. 444, 64 L. Ed. 654, 40 S. Ct. 355, apposite. That case involved the validity of a statute of New Mexico which defined "distributors" of gasoline as those who sell it from tank cars, receiving tanks or stations, or in or from tanks, barrels, or packages not purchased from a licensed distributor, etc., and imposed a gallonage tax on all gasoline sold or used by such distributors. The United States supreme court held that the imposition was a privilege tax; and, as applied to parties who brought gasoline from without and sold it within the state, the act was invalid, as a burden on interstate commerce, in so far as it related to their business of selling in tank car lots and in barrels and packages, as originally imported from other states; but, if separable, the statute was valid in its application to sales

made from such original packages in retail quantities to suit purchasers.

*Wiloil Corp. v. Pennsylvania,* 294 U. S. 169, 79 L. Ed. 838, 55 S. Ct. 358, is not in point, as will clearly appear from examination of the opinion. The United States supreme court held in that case that, if goods carried from one state reach their destination in another state and are held in the second state in original packages for sale, the latter state has power to tax those goods without discrimination, as it does other property within its jurisdiction; that a state tax on distributors of gasoline of so much per gallon sold is not repugnant to the commerce clause of the United States constitution as applied to a case where the vendor, under local contracts for sale of gasoline in tank cars—original packages—to be delivered to the purchasers locally on their rail sidings, was at liberty to take it from local or outside sources and chose to consign it to the purchasers from another state.

*Burke v. Bass,* 123 Neb. 297, 242 N. W. 606, is not an apt authority. The supreme court of Nebraska held in that case that motor vehicle fuel unloaded from a tank car into the shipper's storage tank lost its interstate character and may be subjected to an excise tax upon its use and distribution. That is a different question than the one presented in the case at bar.

In *Mexican Petroleum Corp. v. South Portland,* 121 Me. 128, 115 Atl. 900, 26 A. L. R. 965, the Petroleum Corporation imported oil into the United States in tank steamers from Mexico and pumped that oil into receiving tanks belonging to the Petroleum Corporation at South Portland, Maine, for distribution by the owner (Petroleum Corporation) of the tanks. The oil was withdrawn by the Petroleum Corporation from its storage tanks and sold to buyers in South Portland, Maine, and other portions of New England. The Petroleum

Corporation contested a tax imposed by the city of South Portland upon the oil in the storage tanks, on the ground that the tax was upon imports, therefore illegal as in violation of Art. I, § 10, clause 2, of the United States constitution. The city's position, which was sustained by the supreme court of Maine, was that the oil in the storage tanks had lost its character as an import, because it had been separated from the original receptacle in which it was shipped and was therefore subject to local taxation. The court said:

"It may be regarded as settled then that imported goods lose their character as imports when either of two changes has taken place; first, when they have passed from the control of the importer as by sale, or second, when they have been separated from the original receptacle in which they were shipped. In the case at bar there is no claim that the oil had passed from the control of the importer. The plaintiff company still owned the property. . . .

"The next consideration logically is, whether that original package has been broken, within the purview of the established rule, so that the contents have become a part of the general mass of property.

"In our opinion it has. When the steamer reached Portland the oil was pumped from the steamer tank, the receptacle in which it had been imported, into four tanks located on shore. The original package was thereby broken. The contents were separated from the container and we can detect no real difference between removing the contents from the container and the container from the contents. If the importation had been dry goods in cases, the removal of the cases inclosing the goods would have the same effect as the removal of the goods from the cases. In either case the original unit of importation has been destroyed by separation, and that we understand to be the test. Can it be said that the oil is in its original package when it has been removed from its original container and distributed among and deposited in four different containers on the shore? Neither in fact nor in law is the original package preserved; on the contrary, for it have been substi-

tuted four new and different packages. Suppose a large tierce of liquor was imported and, after the vessel reached port, the liquor was pumped from the tierce into kegs or jugs on the wharf. Could it be successfully contended that these kegs and jugs constituted original unbroken packages?

"Or suppose in the case at bar, instead of pumping the oil from the steamer tank to the shore tanks the transfer were made by workmen with buckets. Would the same claim be made? Neither the method of transfer of the contents nor the nature of the new receptacles is of importance. The vital fact is the separation itself. The fallacy in the plaintiff's contention perhaps lies in the fact that because the oil is in the same form when in the shore tanks as in the steamer's tank, therefore the importation remains unchanged. The oil is indeed in the same form, and necessarily so; but the same is true of other imported goods after they have been removed from the receptacle in which they were imported. That, however, is not the test. The test is whether the integrity of the entire package, that is the imported commodity and the receptacle in which it was imported, has been preserved."

In *Galveston v. Mexican Petroleum Corp.*, 15 F. (2d) 208, it was held that oil brought from Mexico into Galveston, Texas, in tank steamers, and from Galveston distributed under a prior contract to a railroad company at Galveston and to interstate buyers out of Galveston, retained its character as import not subject to local taxation, though some small quantities were sold locally when pumped into tanks from the steamers in which the oil was shipped. The court said, repudiating the court's construction of the import clause in *Mexican Petroleum Co. v. South Portland, supra:*

"The plaintiff contends, too, that, conceding that the defendant was the importer, the goods were not in the original package in which imported, and therefore had become part of the general mass of property in the state. It is a matter of hornbrook knowledge that the original package statement of Justice Marshall was an

illustration, rather than a formula, and that its application is evidentiary, and not substantive, and I cannot give my assent to the view, expressed in the opinion of the Supreme Court of Maine in *Mexican Petroleum Co. v. Portland*, 121 Me. 128, 115 A. 900, 26 A. L. R. 965, that the tanker which brought the oil from Mexico is the original package in the sense of the constitutional construction, whether it is physically so or not. I am therefore of the opinion that the oil, when pumped into the tanks, still retained its state as an import, and would only lose it when, and if, it was maintained in tanks for the purpose of general and indiscriminate sale.

"After all, it is the facts in the case which make the law, and not the law which makes the facts, and the facts here show direct importation, with the provision for sale already made, and the pumping in the tanks a mere step in effecting that purpose. It would be a strained construction to hold that this oil, collected as it was, and distributed as it was, was not an import, within the meaning of the Constitution, and I am content to hold that it was.

"Some stress has been laid upon the fact that a few thousand out of the many million barrels of oil pumped in was sold for local use. The law, like other things, goes on common sense, and if these small spot sales, mainly matters of accommodation as they were, were to be given the effect of changing the character of this oil, it would be a case of the law being made de minimis, and not according to reason."

All that the authorities, upon which the state relies, hold is that, when the importer so acts upon the thing imported that it becomes incorporated into a mass of property in the jurisdiction in which it is brought, the thing imported loses its distinctive character as an import and becomes subject to the taxing power of the state into which the article was brought; if, however, while the thing imported remains the property of the importer and is retained in his warehouse, in his tank car, in his tank steamer, or in his warehouse, in the

original form or package in which it was imported, a tax upon it would be clearly a duty on imports.

Inasmuch as respondent never received the oil in the original package (respondent had nothing to do with the oil until after it was withdrawn from the original package (a tank steamer) and deposited in entirely different containers which were respondent's storage facilities), respondent is not within the third class of distributors defined in the statute. Respondent did not acquire "in this state in the original package or container fuel oil."

As respondent is not subject to the fuel oil tax as a distributor under any of the provisions of chapter 180, Laws of 1935, and chapter 116, Laws of 1937, it follows that appellant is not entitled to recovery on its cross-complaint, and that respondent is entitled to refund of fuel oil taxes paid by it under protest for the months of April and May, 1937.

■■ The next question is whether, having paid to the appellant without protest fuel oil taxes for the period May 1, 1935, to March 31, 1937, respondent is entitled to recovery of those payments as having been made under duress, coercion, and business compulsion.

Counsel for appellant contend that the payments for fuel oil taxes of which respondent complains in its first cause of action were made without protest; therefore, those are voluntary payments and are not recoverable in view of the statute (chapter 62, Laws of 1931, p. 201, Rem. Rev. Stat., § 11315-1 [P. C. § 6882-189] *et seq.*) which requires, as a condition precedent to the maintenance of an action to recover taxes claimed to be illegal, excessive or void, that such taxes be paid under protest.

Chapter 58, Laws of 1933, is made a part of the fuel oil tax statutes (chapter 180, Laws of 1935, and chapter 116, Laws of 1937) and provides, as recited in the

earlier part of this opinion, a method under which fuel oil taxes are made collectible by summary process and thereby compel obedience by the taxpayer without the taxpayer having his day in court. The evidence amply sustains the finding of the trial court that, because of summary nature of the fuel oil tax statutes and the necessity of compliance therewith in order to avoid interruptions in the operation of its railroad and in the use and management of its property which would result from respondent's failure to comply with those statutes, respondent qualified as a distributor of fuel oil and paid the taxes, recovery of which is now sought by respondent.

The penalty provision of the fuel oil tax statutes was designed to accomplish this purpose, and in the case at bar the objective for which it was designed was achieved. That is, the taxes which appellant claims accrued between May 1, 1935, and May 31, 1937, were paid by respondent under duress, coercion, and business compulsion imposed by the summary and self-executing provisions of the fuel oil statutes.

Chapter 62, Laws of 1931, was intended, a reading of that statute clearly shows, to apply exclusively to *ad valorem* taxes. The pertinent section (§ 185, p. 830, Rem. Rev. Stat. (Sup.), § 8370-185 [P. C. § 7030-245]) of the administrative provision of the revenue act (Title XVIII), chapter 180, Laws of 1935) reads as follows:

"The provisions of this title shall not apply with respect to the administration of the taxes imposed under titles XV and XVI, herein, but shall apply with respect to the taxes imposed under all other titles of this act, in such manner and to such extent as is indicated in the last section of each of such titles."

The last section (§ 81, chapter 180, Laws of 1935) of Title XI of the fuel oil tax statute does not make any

of the sections of the general administrative provision applicable to fuel oil taxes, but in lieu thereof provides that chapter 58, Laws of 1933 (except certain sections) shall have full force and application to Title XI as fully as if the words "fuel oil" appeared therein. These same provisions, with some immaterial changes, are carried into the amendatory statute (chapter 116, Laws of 1937). Chapter 58, Laws of 1933, does not contain any specific provision which requires payment under protest in order to obtain a refund of a tax illegally exacted, nor is there present in chapter 58, Laws of 1933, any provision similar to § 198 of the general administrative provision of chapter 180, Laws of 1935, p. 837 (Rem. Rev. Stat. (Sup.), § 8370-198 [P. C. § 7030-258]), requiring payment, as a condition precedent to court action, that all taxes, penalties and interest imposed under the provisions of the act shall be paid in full prior to the institution in any court of an action to contest such tax, penalties or interest. The failure, counsel for appellant contend, to institute an action to enjoin collection of the tax, bars respondent's right to recover the taxes paid under duress, coercion, and business compulsion between May 1, 1935, and May 31, 1937.

If the general administrative provisions of chapter 180, Laws of 1935, are applicable to the fuel oil tax imposed under Title XI, chapter 180, Laws of 1935, then payment under protest is not required, nor is respondent given the right to bring injunction proceedings.

It would not be reasonable to hold that it was the intention of the legislature to classify actions for recovery of fuel oil and gasoline taxes with actions for recovery of *ad valorem* taxes by requiring payment of all such taxes under protest and to waive protest as to all other excise taxes.

Statutes should be construed as a whole. The intention of the legislature may not be shown by taking one section or sentence of a statute. If we are mindful of that rule, we plainly see, in reading all of chapter 62, Laws of 1931, that the legislature intended that statute to apply solely to *ad valorem* taxes.

Section 1 of that statute, p. 201, provides that no injunction shall be granted to restrain the collection of any tax except in two cases. The second exception is "where the *property* upon which the tax is imposed is exempt from taxation." (Italics ours.) An excise tax is not imposed upon property, but is a charge made for a privilege enjoyed. *Vancouver Oil Co. v. Henneford,* 183 Wash. 317, 49 P. (2d) 14. Section 1 would have no meaning if chapter 62, Laws of 1931, were meant to apply to excise taxes. We held in *State v. Fidelity & Deposit Co. of Maryland,* 194 Wash. 591, 78 P. (2d) 1090, that the fuel oil tax imposed by Title XI, chapter 180, Laws of 1935, is an excise tax imposed upon persons with respect to the privilege of distributing fuel oil.

Section 2, chapter 62, Laws of 1931, p. 201, provides that, in all cases of the levy of taxes for public revenues which are deemed unlawful or excessive by the person, firm or corporation *whose property is taxed,* or from whom such tax is demanded or enforced, such person may pay such tax under written protest, and thereupon the person so paying may bring an action in the superior court against the state, county, or municipality by whose officers the same was collected to recover such tax or any portion thereof so paid under protest. Attention is again directed to the fact that it is only the person whose *property* is taxed that is permitted to pay the tax under protest and recover a refund. The *property of a person paying* the *fuel oil tax is*

*not taxed; that tax is an excise tax.* The omission by the legislature of any reference to "licenses," or any term which would clearly include the fuel oil tax, evinces the intention of the legislature that chapter 62, Laws of 1931, should not apply to an excise tax.

Section 3 of chapter 62, Laws of 1931, p. 202, provides for a judgment for recovery of taxes paid under protest and the payment of that judgment. In that section, it is patent that the legislature did not intend to include excise taxes, such as the fuel oil tax, because, after the provision for a judgment in favor of the plaintiff when it is determined that the taxes unlawfully collected, is the provision that:

"In case the action is against a county and the judgment shall become final, the amount of such judgment, including legal interest and costs where allowed, shall be paid out of the treasury of such county by the county treasurer upon warrants drawn by the county auditor against a fund in said treasury hereby created to be known and designated as the county tax refund fund. Such warrants shall be so issued upon the filing with the county auditor and the county treasurer of duly authenticated copies of such judgment, and shall be paid by the county treasurer out of any moneys on hand in said fund. If no funds are available in such county tax refund fund for the payment of such warrants, then such warrants shall bear interest in such cases and shall be callable under such conditions as are provided by law for county warrants, and such interest, if any, shall also be paid out of said fund."

The only provision made for payment of a judgment is in the event the action is against a county. The fuel oil tax is payable to the treasurer of the state of Washington (§ 8, chapter 58, Laws of 1933; § 81, chapter 180, Laws of 1935; § 4, chapter 116, Laws of 1937). No action would lie against a county for a refund of the fuel oil tax. If there had been any intention to apply chapter 62, Laws of 1931, to excise taxes, which are

payable to the state, surely there would have been included in the act a provision for payment of judgments obtained against the state.

Section 4 of chapter 62, Laws of 1931, p. 202, provides for the levying of taxes for the county tax refund fund by the *proper county officers* upon *all of the taxable property within the county* and upon *all of the taxable property of each taxing district within the county*. Clearly, the legislature did not contemplate anything other than *ad valorem* taxes and did not have in mind excise taxes which are payable only to the state of Washington.

Section 5, chapter 62, Laws of 1931, p. 203, provides that the venue of actions for the recovery of taxes paid under protest shall be the superior court of the county wherein the tax was collected. The proviso to this section is to the effect that, where the *property* against which the tax is levied consists of the *operating property of a railroad company,* etc., the venue may be made in the superior court of any one of the counties in which such tax is paid.

Section 6, chapter 62, Laws of 1931, p. 204, limits the time in which actions may be instituted to recover taxes.

Section 7, chapter 62, Laws of 1931, p. 204, provides, "Except as permitted by this act, no action shall ever be brought attacking the validity of any tax, or any portion of any tax." This applies only to those taxes (*ad valorem taxes*) contemplated by the legislature in enactment of chapter 62, Laws of 1931.

There is a general rule that a tax paid voluntarily cannot be recovered back after the statute levying the tax has been declared unconstitutional; however, that rule is subject to the qualification that, if the tax has been paid under duress, coercion, or business compulsion, then it may be recovered back as an involuntary

payment. It is not essential that express protest be made at the time of payment, as that is only one class of evidence that the payment was made under coercion.

The trial court found (the evidence does not preponderate against that finding) that respondent qualified as a distributor of fuel oil and paid the taxes, the validity of which respondent now challenges, because of the summary nature of the fuel oil tax statutes and the necessity of compliance therewith in order to avoid interruption of the operation of its railroad and in the use and management of its property which would result from respondent's failure to comply with those statutes.

A tax so paid is paid under duress or business compulsion and is therefore involuntary. Non-compliance with the law may be made so disadvantageous as effectively to induce compliance, even though the law leaves compliance or non-compliance voluntary. In declaring the agriculture adjustment act unconstitutional, the United States supreme court held in *United States v. Butler,* 297 U. S. 1, 80 L. Ed. 477, 56 S. Ct. 312, that the effect of the act was to exert coercion by economic pressure, making acceptance of its provisions in fact involuntary. The coercive purpose and effect of the penal provision of the fuel oil tax statutes was amply sufficient to break down the resistance of a taxpayer who was not certain whether he was a distributor. There was a yielding to compulsion precisely the same as if the respondent did so to avoid jail sentences and fines imposed on its officers and employees and to prevent interruptions in the operation and in the use and management of its property. The United States court of appeals for the District of Columbia in *Thompson v. Deal,* 92 F. (2d) 478, 484, aptly said:

"Whatever may have been the old rule as to the characteristics of duress and coercion, a more liberal

view prevails, and ought to prevail, today—a change of view point which has arisen as the government has extended its control over the domestic concerns of the citizen. The Supreme Court of Wisconsin has expressed this better view as follows: 'The old rule that there could be duress only where there was a threat of loss of life, limb, or liberty has been so changed that duress may sometimes be implied when a payment is made or an act performed to prevent great property loss or heavy penalties ᵥᵣhen there seems no adequate remedy except to submit to an unjust or illegal demand and then seek redress in the courts.'

"We are not unmindful of the rule that ordinarily when money has been voluntarily paid with full knowledge of the facts it can not be recovered on the ground the payment was made under a misapprehension of the legal rights and obligations of the person paying. But we think this rule has no present relevancy for, as Mr. Justice Clifford said in *United States v. Ellsworth,* 101 U. S. 170, 174, 25 L. Ed. 862, in a very clear case of what many courts would have called a voluntary payment made under misapprehension of legal rights: 'Call it mistake of law or mistake of fact, the principles of equity forbid the United States to withhold the same from the rightful owner.' "

In *Union Bag & Paper Corp. v. State,* 160 Wash. 538, 295 Pac. 748, 74 A. L. R. 1295, the plaintiff sought recovery from the state of corporation filing, and other, fees paid for the right to transact business in this state. The complaint alleged that the statutes under which the fees were exacted were violative of plaintiff's rights under the constitution of the United States. The state's demurrer to the complaint was overruled and judgment entered in favor of the plaintiff. In affirming that judgment, we used the following language and reviewed certain authorities which make that opinion applicable to the facts in the case at bar:

"The argument of counsel for the state, as we understand them, proceeds upon the theory that, since plaintiff's complaint, especially in its first and second

causes of action, fails to allege that the power corpora-' tion expressly protested to the secretary of state against the payment of the filing and license fees exacted by him as prescribed by the statutes, the plaintiff is precluded from recovery as prayed for. We may concede that there are decisions which would sustain this contention, if this were a question of the payment of an illegal tax exaction, involving nothing more in its consequence than the collection of the tax as a mere civil liability against the corporation or its property, and did not otherwise impair or embarrass the business of the corporation. Our decisions in *Tozer v. Skagit County,* 34 Wash. 147, 75 Pac. 638, *Drum v. University Place Water Dist.,* 154 Wash. 700, 281 Pac. 731, and perhaps in some other cases, lend support to this contention, applicable to such a tax exaction.

"However, it seems to us that express protest, at the time of payment, is but one class of evidence of the payment being made under coercion. Here, we have other very convincing evidence of coercion. Had the payments of the statutory prescribed filing and license fees not been made by the power corporation at about the time they were paid, the business rights of that corporation within this state would have been, by the express terms of the statutes above noticed, seriously threatened in the particulars above noticed. We are of the opinion that the allegations of the plaintiff's complaint, admitted by the demurrer as true, show that the payments of the exacted filing and license fees were made under such coercion as to render the state liable to return the amounts so paid, though it does not appear that they were paid under express protest.

"In the text of 26 R. C. L., p. 457, we read:

" 'The modern tendency is toward greater liberality in recognizing the implied duress under which payment of a tax is almost always made, and even when no seizure of the taxpayer's goods is imminent, if he is put at a serious disadvantage in the assertion of his legal rights in defending proceedings brought to collect the tax, justice may require that he should be at liberty to avoid this disadvantage by paying promptly

and bringing suit on his own side. He is entitled to assert his supposed right on reasonably equal terms. When payment of an illegal tax is made in order to avoid a penalty or disability which may be imposed upon the taxpayer without giving him his day in court, such payment will be considered involuntary.'

"And further, on page 459:

" 'If payment of an illegal tax is made under duress, it need not be paid under protest to entitle the taxpayer to recover it back, if he makes it clear that his payment is involuntary, and a protest in such a case is important only as evidence that the payment was the effect of the duress.'

"In the text of 4 Dillon on Municipal Corporations (5th ed.), § 1620, it is said:

" 'The coercion or duress which will render a payment of taxes involuntary must in general consist of some actual or threatened exercise of power possessed, or assumed to be possessed, by the party exacting or receiving the payment, over the person or property of another, from which the latter has no other means or reasonable means of immediate relief except by making payment.'

"In the text of 3 Cooley on Taxation (4th ed.), § 1297, it is said:

" 'Independent of statute, a payment is not compulsory merely because made under protest. On the other hand, if paid under compulsion, no protest is necessary. However, in case of doubt, protest may be taken into account in determining the question of duress.'

"In *Cox v. Welcher*, 68 Mich. 263, Justice Campbell, speaking for the court, made this general observation:

" 'Where payments are involuntary, and made under legal duress, there has never been any rule requiring a specific protest. The attempt to compel payment where there is no legal burden is regarded as a legal injury, and payment made to avoid the seizure and sale of property to pay the wrongful claim can be recovered back as an extorted sum for which there was no consideration.'

"It is true that the payment by the power corporation of the exacted filing and license fees here in question, was not directly to avoid the unlawful seizure

and sale of any of the power corporation's property; but the payments were made to avoid the above noticed statutory threatened interference with its lawful business in this state. Among other decisions lending strong support to our present view of the power corporation's rights here drawn in question, we note: *City of Chicago v. Sperbeck,* 69 Ill. App. 562; *American Dist. Telegraph Co. v. City of New York,* 213 App. Div. 578, 211 N. Y. Supp. 262; 243 N. Y. 565, 154 N. E. 607; *Newberry v. City of Detroit,* 184 Mich. 188, 150 N. W. 838; *Swift Co. v. United States,* 111 U. S. 22; *Atchison, T. & S. F. R. Co. v. O'Connor,* 223 U. S. 280.

"Our own decision in *Olympia Brewing Co. v. State,* 102 Wash. 494, 173 Pac. 430, is in harmony with, and in principle strongly supports, our present view. While there seems to have been a formal protest against the payment of the license fee there exacted of and paid by the brewing company, we said:

" 'The fact that the fees were paid with or without protest is of no moment if their payment was made under compulsion, and it cannot be gainsaid that payments made to prevent the sacrifice of large capital investments are not voluntarily made but are made as the result of compulsion.' "

The judgment awarding recovery to respondent on its first and second causes of action and denying recovery to appellant on its cross-complaint is affirmed.

SIMPSON, GERAGHTY, and ROBINSON, JJ., concur.

BLAKE, C. J. (dissenting)—Respondent brought this action for a refund of excise taxes paid as a "distributor" of fuel oil under the provisions of chapter 180, Laws of 1935. It set up two causes of action: One for the recovery of $206,790, with interest, for taxes paid pursuant to the act, without protest; the other for $17,517, with interest, for taxes paid under protest. The appellant cross-complained for $129,000 for taxes due and accruing under the act subsequent to May, 1938. The lower court entered judgment in favor of

the respondent on both causes of action and denied recovery to the state on its cross-complaint.

The judgment was based on the holding of this court in *State v. Fidelity & Deposit Co. of Maryland,* 194 Wash. 591, 78 P. (2d) 1090. I do not think, however, that that case is authority for holding that respondent is not a "distributor" under the third definition contained in Laws of 1935, chapter 180, § 79. While in that case it was broadly stated that the Northern Pacific Railway Company did not come under any of the definitions contained in § 79, the question presented and decided was whether the railway company came within the second definition as one who *"imports any fuel oil,"* etc.

I think that respondent clearly comes within the third definition of the term "distributor" as defined in § 79. That provides:

"The word 'distributor' shall mean and include . . . any person who having acquired in this state in the original package or container fuel oil and/or diesel oil, shall distribute or sell the same, whether in such original package or container in which the same was imported or otherwise, *or in any manner uses the same;* . . ." (Italics mine.)

And I am warranted in saying that the respondent thought so, too, until this court handed down its decision in *State v. Fidelity & Deposit Co. of Maryland, supra.* For, on June 4, 1935, respondent, pursuant to § 81 (incorporating as a part of the title chapter 58, Laws of 1933, § 2), applied to the director of licenses for a license as a "distributor" of fuel oil. This license was voluntarily renewed by respondent on July 1, 1936, and again on June 17, 1937.

I dissent.